**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-2048**

_____

JOYCE ANDERSON,

　　　　　Plaintiff – Appellant,

　　v.

CONSOLIDATION COAL COMPANY,

　　　　　Defendant – Appellee,

　　　　and

CONSOL ENERGY, INC.,

　　　　　Defendant.

_____

Appeal from the United States District Court for the Northern
District of West Virginia, at Clarksburg.  Frederick P. Stamp,
Jr., Senior District Judge.  (1:11-cv-00138-FPS-JSK)

_____

Argued:  October 29, 2015　　　　　Decided:  January 21, 2016

_____

Before WILKINSON, SHEDD, and WYNN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Shedd wrote the majority
opinion, in which Judge Wilkinson joined.  Judge Wynn wrote a
dissenting opinion.

_____

**ARGUED**: Allan Norman Karlin, ALLAN N. KARLIN & ASSOCIATES,
Morgantown, West Virginia, for Appellant.  Larry Joseph Rector,
STEPTOE & JOHNSON, PLLC, Bridgeport, West Virginia, for
Appellee.  **ON BRIEF**: Jane E. Peak, ALLAN N. KARLIN & ASSOCIATES,

Morgantown, West Virginia, for Appellant.  Denielle M. Stritch,
STEPTOE & JOHNSON, PLLC, Morgantown, West Virginia, for
Appellee.

————————

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

While working in a coal mine operated by Consolidation Coal Company ("CCC"), Joyce Anderson fell and suffered multiple bone fractures. Before her fall, Anderson had been diagnosed as having osteoporosis. After her recovery, Anderson attempted to return to her former job. Presented with conflicting medical evidence about Anderson's post-injury ability to work safely in the mine, CCC implemented a medical-review process dictated by its collective bargaining agreement ("CBA") with her union. Because two of the three doctors selected under the CBA process opined against Anderson's return to underground work, CCC prohibited her from returning to her former position. Anderson filed an unsuccessful labor grievance, and when CCC was unable to find a suitable alternative position for her, it terminated her employment. Anderson then filed this lawsuit contending (among other things) that CCC violated West Virginia law by retaliating against her for filing a workers' compensation claim and by discriminating against her based on the fact that she has osteoporosis. The district court granted CCC's summary judgment motion on these claims, and Anderson now appeals. For the following reasons, we affirm.

I

Federal Civil Procedure Rule 56(a) provides that the district court "shall grant summary judgment if the movant shows

3

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We review a summary judgment order de novo. Lee Graham Shopping Ctr., LLC v. Estate of Kirsch, 777 F.3d 678, 681 (4th Cir. 2015).

West Virginia Code § 23-5A-1 provides that "[n]o employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive" workers' compensation benefits. West Virginia Code § 5-11-9(1) provides that it is unlawful "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled."

For claims under either statute, the employee bears the ultimate burden of proving the employer's illegal motive. See CSX Transp., Inc. v. Smith, 729 S.E.2d 151, 169 (W.Va. 2012) (retaliation); Hanlon v. Chambers, 464 S.E.2d 741, 748 (W.Va. 1995) (discrimination). Where, as here, there is no direct evidence of retaliation or discrimination, the general scheme of proof for both claims is substantially the same: (1) the employee bears the burden of presenting a prima facie case; (2) if she presents a prima facie case, the burden shifts to the employer to present a legitimate, nondiscriminatory reason for

4

her discharge; and (3) if the employer presents such a reason, the employee must establish that the proffered reason is pretextual. See Powell v. Wyoming Cablevision, Inc., 403 S.E.2d 717, 721-22 (W.Va. 1991) (retaliation); Conaway v. Eastern Assoc. Coal Corp., 358 S.E.2d 423, 429-30 (W.Va. 1986) (discrimination).

## II

The following material facts are not disputed. Anderson is a long-time CCC employee who was diagnosed with osteoporosis in 2005. In November 2009, while Anderson was working in the Loveridge Mine, she fell and fractured her elbow and pelvis. Anderson was treated by Dr. Nancy McKinley, an orthopedic surgeon and also underwent physical therapy. Anderson filed a workers' compensation claim for this injury and received workers' compensation benefits.

Several months later, Dr. McKinley released Anderson to return to work. Before allowing her to return, CCC (through its workers' compensation administrator) obtained a medical examination, which included a bone density scan. Dr. Dean Steinman performed this examination and found that the scan results, accompanied by other risk factors and the severity of her injuries from her relatively minor 2009 fall, presented too great a risk of re-fracture to return her to work in the coal mine. When Dr. Steinman's report was presented to Dr. McKinley

for review, Dr. McKinley noted that although "common sense" may suggest that Anderson not return to work in the mine, J.A. 1262, she did not believe that Anderson was precluded from doing so. Faced with this conflict of opinions, CCC approved a record review by Dr. Vincent Ripepi. Following his review, Dr. Ripepi agreed with Dr. Steinman.

Anderson disagreed with Dr. Steinman's and Dr. Ripepi's medical opinions. CCC therefore implemented Article III(j) of the CBA. In pertinent part, Article III(j) provides that "once employed, an Employee cannot be terminated or refused . . . recall from sick or injured status for medical reasons over his objection without the concurrence of a majority of a group composed of an Employer-approved physician, an Employee-approved physician, and a physician agreed to by the Employer and the Employee, that there has been a deterioration in physical condition which prevents the Employee from performing his regular work." J.A. 861.

Anderson selected Dr. McKinley as the "Employee-approved physician," and CCC selected Dr. Steinman as the "Employer-approved physician." By agreement, the parties then met to select the third physician, who would be the tiebreaker. Each party proposed four doctors at this meeting, and each party struck three names proposed by the other, leaving each party

6

with a single physician remaining.[1] The names of the two remaining physicians, Dr. Sushil Sethi – who was CCC's choice – and Dr. Shelly Kafka – who was Anderson's choice - were placed in a hat. Anderson selected Dr. Kafka's name out of the hat, and CCC agreed to use Dr. Kafka. However, Dr. Kafka declined to participate in the evaluation process.

Anderson then put forth two additional doctors' names. CCC struck one doctor, leaving Dr. Brian Houston as Anderson's proposed doctor. Dr. Houston's name was then placed in the hat with Dr. Sethi's name. Anderson again selected a name from the hat, this time choosing Dr. Sethi. Anderson did not object to being seen by Dr. Sethi, and he performed her physical examination. Thereafter, Dr. Sethi opined that Anderson was not able to work safely underground because of her high risk for repeat fracture. Specifically, Dr. Sethi stated:

> On the basis of my examination and review of the medical records as well as my thorough research of osteoporosis, it is my medical opinion that the deterioration of the bone due to early onset of

---

[1] Helen Blevins, a registered nurse, testified on behalf of CCC that a limited number of area doctors were willing to engage in workers' compensation and similar evaluative work. When she selected doctors for the CBA process, she looked at factors such as a doctor's capability, knowledge, availability, willingness, and timeliness in an effort to obtain the best and most timely results. Anderson argues that proof of CCC's improper motives lies in the fact that CCC proffered only doctors who were not osteoporosis specialists. However, CCC did proffer an orthopedic surgeon, but Anderson struck this doctor from the list.

menopause as well as aging and having caused a fracture with a very minor activity, is a very high risk factor in performing her regular work. The use of medication including Boniva as well as other listed medications that are available on the market, simply prevent some osteoclastic activity. It does not cure the problem of osteoporosis. After having reviewed the job duties and the risk factors as well as the description of the bunker employee including ability to have the capability of safely evacuating the mine in the event of an emergency, I can say with reasonable degree of medical probability and certainty, that [Anderson] is not able to safely perform her regular work as a bunker attendant at Loveridge Mine. She is a very high risk for repeat fracture which can happen spontaneously or even from a minor tripping and would be a risk to herself as well as other fellow workers.

J.A. 865-66.

Thus, the majority of the medical opinions obtained under the CBA process recommended that Anderson's high fracture risk made it unsafe for her to return to work in the coal mine. CCC attempted to accommodate Anderson with a surface position as a dispatcher. CCC's effort, however, was precluded by seniority rules in the CBA. Anderson then filed a grievance seeking reinstatement, but an arbitrator ruled against her, finding that CCC complied with the CBA. CCC encouraged Anderson to apply for an open above-ground position. Although Anderson applied and was interviewed for this position, she ultimately declined to pursue it. Unable to find a satisfactory alternative position for Anderson, CCC terminated her employment.

8

Anderson filed this action asserting several state-law claims. Pertinent to this appeal, Anderson alleged that CCC (1) retaliated against her for filing a workers' compensation claim, in violation of § 23-5A-1 and (2) discriminated against her based on the fact that she has osteoporosis - which CCC perceived to be, or which is in fact, a disability - in violation of § 5-11-9(1). At the close of discovery, CCC moved for summary judgment on several grounds. The district court granted the motion for the following reasons.

Regarding Anderson's workers' compensation retaliation claim, the district court noted that Anderson was required to show three elements to establish a prima facie case: (1) she sustained an on-the-job injury; (2) she filed a claim for workers' compensation benefits; and (3) CCC treated her filing of a workers' compensation claim as a significant factor in its decision to discharge her. See Powell, 403 S.E.2d at 721. The court found that although Anderson sufficiently showed the first two elements, she failed to show the third element. The court explained that CCC "acted under the CBA which governed the procedure" regarding her potential return to work and "a majority of the necessary medical opinions found that [Anderson] should not return to work." J.A. 1039. The court stated: "Simply put, no evidence exists to demonstrate or imply that [CCC]

terminated [Anderson] with [workers'] compensation costs serving as a 'significant' factor." J.A. 1039-40.

Regarding Anderson's disability discrimination claim, the district court noted that Anderson was required to show three elements to establish a prima facie case: (1) she is a member of a protected class; (2) CCC took an adverse action against her; and (3) but for her protected status, CCC would not have taken the adverse action. See Conaway, 358 S.E.2d at 429. Again, the court found that Anderson sufficiently showed the first two elements, but she failed to show the third element. The court explained that although CCC was aware of Anderson's osteoporosis, it did not base the decision to terminate her on the grounds that she is disabled. The court stated:

> Rather, in compliance with the CBA, [CCC and Anderson] received three medical opinions regarding [her] ability to return to work. Of those three opinions, two of the opinions advised the parties that [Anderson] should not return to work. Relying on these medical opinions, and not simply [her] status as "disabled" . . . [CCC] terminated her employment.

J.A. 1044.

The district court addressed and rejected Anderson's argument that the doctors chosen by CCC for the CBA process were "company doctors" rather than osteoporosis specialists. The court found that "insufficient evidence has been offered to support these claims, and they are speculation at best." J.A. 1044. Further, the court stated that "the specialty-level of the

10

doctors in this case is not a germane issue to the law at issue." J.A. 1044-45. Reiterating its earlier discussion of the workers' compensation retaliation claim, the court explained:

> The facts show that [CCC] acted under an honest belief regarding whether to discharge [Anderson], basing the decision on the recommendations by licensed physicians with experience, though technically not specialties, in osteoporosis. Both parties together selected the third physician, meaning that [Anderson] herself agreed to be examined by this physician. More importantly, the terms of the CBA do not require the evaluating doctors be specialists in their field. Thus, the argument that the evaluating doctors did not practice in any medical specialty or possess any particular certification relating to osteoporosis is not relevant in this civil action, as such was not required under the CBA.

J.A. 1045.

The district court further concluded that even if Anderson had shown a prima facie case of disability discrimination, CCC offered a legitimate nondiscriminatory reason for her discharge: the CBA medical review process, which led to the medical opinions advising that she not return to her former position. Finally, the court found that Anderson failed to present sufficient evidence of pretext to rebut CCC's proffered reason.

IV

Anderson contends that the district court erred in several respects by granting CCC's summary judgment motion. Anderson primarily argues that the court erred in assessing her disability discrimination claim because it failed to conduct the

11

analysis set forth in West Virginia Code of State Rules § 77-1-4.8. She also argues with respect to both of her claims that the court resolved disputed facts against her and failed to recognize the existence of genuine issues of material fact. In response, CCC argues that the court correctly entered summary judgment on Anderson's claims.

Having carefully considered this matter under the appropriate summary judgment standard, we agree with the district court that the undisputed material facts in the record establish as a matter of law that CCC's decision to terminate Anderson's employment was not based on a discriminatory or retaliatory motive. Instead, those facts establish that when Anderson attempted to return to work following her work-related injury, CCC was presented with conflicting medical opinions about whether she could do so safely.[2] For that reason, CCC implemented the CBA medical-review process, in which Anderson fully and freely participated, and two of the three doctors selected in that process opined against her return to the coal

---

[2] CCC's decision to have Anderson evaluated before returning her to work did not violate West Virginia law. See, e.g., Stone v. St. Joseph's Hosp. of Parkersburg, 538 S.E.2d 389, 407 (W.Va. 2000) ("[T]he mere fact that the Hospital sent Mr. Stone for an independent medical examination did not prove a case of disability discrimination.").

mine.[3] Consequently, CCC was then within its collectively bargained right to prohibit Anderson from returning to the coal mine. Ultimately, CCC terminated Anderson's employment only after it was unable to place her in a suitable alternative position.

Anderson has proffered evidence which she contends creates genuine issues of material fact about the qualifications and opinions of the doctors who examined her as part of the CBA medical-review process and about the purported motives of CCC personnel. We have considered this evidence in our summary judgment review. However, we conclude that Anderson has failed to present sufficient evidence to create a genuine issue of material fact to establish that her filing of a workers' compensation claim was a significant factor in CCC's decision to terminate her. For this reason, we affirm the grant of summary judgment on the retaliation claim. See, e.g., Yoho v. Triangle PWC, Inc., 336 S.E.2d 204, 210 (W.Va. 1985) (affirming dismissal of § 23-5A-1 claim where the employee was discharged pursuant to a "facially neutral provision of the collective bargaining

---

[3] Dr. Ripepi also opined against Anderson's return to work in the mine. Therefore, three doctors who considered the matter before Anderson was terminated believed that she should not return to the mine. Moreover, Dr. McKinley (who was Anderson's choice in the Article III(j) process) equivocated, stating that "common sense" suggested that Anderson not return to the mine.

agreement"). Likewise, we conclude that even if Anderson presented sufficient evidence to establish a prima facie case of discrimination, CCC has presented a legitimate, non-discriminatory reason for terminating her employment (i.e., the CBA medical-review process), and she has failed to present sufficient evidence to establish pretext. Therefore, we affirm the grant of summary judgment on the discrimination claim. See, e.g., Bailey v. Norfolk and W. Ry. Co., 527 S.E.2d 516, 536 (W.Va. 1999) (noting that the parties' collective bargaining agreement provided a legitimate, non-discriminatory reason for the challenged action).

As noted, Anderson primarily argues that the district court failed to analyze her discrimination claim under West Virginia Code of State Rules § 77-1-4.8. We disagree with Anderson's contention that § 77-1-4.8 dictates a different outcome.

Rule 77-1-4 is titled "Employment Discrimination Prohibited" and is part of "a detailed explication of the general anti-discrimination requirements of the Human Rights Act, [§ 5-11-9]." Stone, 538 S.E.2d at 396 n.8. Section 77-1-4.1 and its subsections prohibit disability discrimination in employment. Various other sections of Rule 77-1-4 deal with matters that are unrelated to this case, but two sections, §§ 77-1-4.7 and 4.8, are pertinent to our discussion.

Section 77-1-4.7 provides that an "individual's ability to perform a particular job must be assessed on an individual basis," and an employer "may discharge a qualified individual with a disability if, even after reasonable accommodation, the individual is unable to perform the essential functions of the job without creating a substantial hazard to his/her health and safety or the health and safety of others." Section 77-1-4.7 cautions that "any such decision shall be [based] upon the individual's actual abilities, and not upon general assumptions or stereotypes about persons with particular mental or physical disabilities."

Section 77-1-4.8 then provides that "[i]n deciding whether an individual poses a direct threat to health and safety, the employer has the burden of demonstrating that a reasonable probability of a materially enhanced risk of substantial harm to the health or safety of the individual or others cannot be eliminated or reduced by reasonable accommodation." Further, § 77-1-4.8 specifies that "[t]he employer's determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgement [sic] that relies on the most current medical knowledge and/or on the best available objective evidence." Section 77-1-4.8

15

concludes by listing several non-exclusive factors to be considered in determining whether an individual would pose a direct threat.

According to Anderson, § 77-1-4.8 "is an affirmative defense that requires the employer to prove that the medical opinion upon which it relies was based on an 'individualized assessment' of the employee, on 'competent medical advice' and on the 'most current medical knowledge' in the relevant field." Opening Brief of Appellant, at 8.[4] Anderson argues that CCC failed to comply with § 77-1-4.8 because it selected and recommended evaluators who "it knew or should have known had little or no expertise in osteoporosis, who lacked 'current medical knowledge' about the disease and who did not provide competent opinions about [her] risk of future injury." Id. at 9.

Although the role of § 77-1-4.8 within the shifting-burden analysis used for employment discrimination claims is not entirely clear, we will assume that the section becomes applicable when, in response to an employee's prima facie case, the employer asserts that an employee cannot safely perform her job as a legitimate, non-discriminatory reason for termination.

---

[4] In Stone, the court explained that "to satisfy the standard of a serious threat to one's health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm." 538 S.E.2d at 397 (emphasis added and citation omitted).

16

As we have already held, the undisputed evidence establishes that CCC terminated Anderson as a result of the CBA medical-review process, which is unquestionably a legitimate, non-discriminatory reason. Contrary to Anderson's argument, we conclude that through its implementation of the CBA medical-review process, CCC met its burden under § 77-1-4.8.[5]

Fundamentally, § 77-1-4.8 requires that the employer's decision must be made on "an individualized assessment of the individual's present ability to safely perform the essential functions of the job." By relying on the various specific medical opinions obtained before and during the CBA medical-review process, CCC made its decision about Anderson's ability to return to the coal mine on an individualized assessment of her condition and ability rather than "upon general assumptions or stereotypes about persons" with osteoporosis. § 77-1-4.7.

---

[5] CCC unsuccessfully argued below that Anderson's claims are preempted by the Federal Labor Management Relations Act ("LMRA"). CCC reiterates this argument as one of several alternate bases for affirming the summary judgment. We need not decide the issue, but we note that Anderson's reliance on § 77-1-4.8 does raise a significant LMRA preemption question. See Barton v. House of Raeford Farms, Inc., 745 F.3d 95, 107 (4th Cir.), cert. denied, 135 S.Ct. 160 (2014) (stating the general rule that when the evaluation of the state law claim is inextricably intertwined with consideration of the terms of the labor contract, such that it is necessary to interpret the collective-bargaining agreement to resolve the claim, the claim is preempted).

Moving forward in the analysis, § 77-1-4.8 specifies that the individualized assessment must be based on a "reasonable" medical judgment (from a competent medical practitioner) who relies on "the most current medical knowledge" or on "the best available objective evidence."[6] We believe the undisputed material evidence in the record establishes that CCC met this standard. CCC utilized doctors who had the ability to conduct the medical testing specific to Anderson's condition and who were experienced in providing occupational medical evaluations. These doctors assessed Anderson's bone density scans, along with other risk factors, and examined extensive details regarding the specific job requirements of her position. To be sure, Anderson points to conflicting evidence regarding her ability to return to her former position, but the fact that medical opinions differ does not establish that CCC's reliance on Dr. Steinman's and Dr. Sethi's assessments was unreasonable.[7] Moreover, although

_____

[6] Section 77-1-4.8 states that the assessment "shall be based on a reasonable medical judgement [sic] that relies on the most current medical knowledge and/or on the best available objective evidence." The term "and/or" typically means "or." See Curry v. W.Va. Consol. Pub. Retire. Bd., 778 S.E.2d 637, 642 n.4 (W.Va. Oct. 7, 2015); Dynalectron Corp. v. Equitable Trust Co., 704 F.2d 737, 739 (4th Cir. 1983).

[7] As noted, Anderson recommended both Dr. McKinley and Dr. Kafka during the CBA medical-review process, but Dr. Kafka declined to participate. Dr. Kafka did examine Anderson at a later time, and Anderson now relies on Dr. Kafka's opinion to support her case. Had Dr. Kafka rendered her opinion during the (Continued)

18

Anderson contends that CCC was required to utilize and rely only on osteoporosis specialists in making its individualized assessment, we find nothing to establish that § 77-1-4.8 imposes such a rigid requirement. See generally Farley v. Shook, 629 S.E.2d 739, 746 (W.Va. 2006) ("While a physician does not have to be board certified in a specialty to qualify to render an expert opinion, the physician must have some experience or knowledge on which to base his or her opinion.").

V

We are not unsympathetic to Anderson's desire to return to her job. However, West Virginia law recognizes "the right of an employer to protect employees, the public, and the workplace from danger or injury that might occur as a result of a person's possible impairments, when such protection is done in a fashion that is consistent with the duty of reasonable accommodation." Stone, 538 S.E.2d at 397. This right is also embodied in the CBA. Based on the record before us, we agree with the district court that the undisputed material evidence establishes that CCC

---

CBA process, she would have cast the tiebreaking vote in Anderson's favor, and CCC presumably would have been obligated under the CBA to return Anderson to work. These facts highlight the role of the CBA process in Anderson's termination and undercut her claims of retaliation and discrimination.

did not illegally retaliate or discriminate against her. Therefore, we affirm the judgment.

AFFIRMED

WYNN, Circuit Judge, dissenting:

Joyce Anderson was fifty-two years old and had a satisfactory work record nearly three decades long when Consolidation Coal Company ("CCC") terminated her, on the grounds that her osteoporosis prevented her return to work after recovering from a fracture. Ostensibly, CCC based her termination on company-directed medical evaluations rendered after Anderson's treating orthopedic surgeon had already unreservedly cleared her to return to work, and those evaluations appear to have been based largely on an erroneous interpretation of a single study found through Google or similar search engines.

The majority opinion nevertheless concludes that there is no genuine factual dispute regarding whether CCC's termination decision satisfied the relevant state standards—that is, whether it was based on a "reasonable" medical judgment, one "that relie[d] on the most current medical knowledge and/or on the best available objective evidence." Ante, at 18; W. Va. Code R. § 77-1-4.8. I cannot reach the same conclusion. For this reason and those elaborated below, I dissent.

I.

A.

The majority opinion assumes, without deciding, that Anderson has successfully made out a prima facie case of

21

disability discrimination.  Ante, at 14.  In my view, the issue is simple enough to decide.  Anderson provided abundant evidence that she was "regarded as" disabled by CCC, W. Va. Code § 5-11-3(m)(3); Stone v. St. Joseph's Hosp. of Parkersburg, 538 S.E.2d 389, 399 (W. Va. 2000), and that "but for" that perception of her disability, she would not have been terminated.  See Conaway v. E. Associated Coal Corp., 358 S.E.2d 423, 429 (W. Va. 1986) (enumerating the elements of a prima facie discrimination claim under West Virginia Code § 5-11-9).  The district court therefore erred in concluding that Anderson failed to make out a prima facie case of disability discrimination.[1]

B.

The majority opinion concludes that Anderson failed to make out a prima facie case of workers' compensation retaliation, ante, at 13, which requires an employee to offer sufficient evidence that: "(1) an on-the-job injury was sustained; (2) proceedings were instituted under the Workers' Compensation Act

---

[1] The district court arguably should have applied a different prima facie test, specific to disability discrimination suits in West Virginia, which requires that the plaintiff (1) satisfy the definition of "handicapped" or "disabled," (2) be able to perform, with reasonable accommodation, the relevant job, and (3) was discharged. Hosaflook v. Consolidation Coal Co., 497 S.E.2d 174, 179–80 (W. Va. 1997).  Anderson provided sufficient evidence to satisfy these elements, too.  Cf. Morris Mem'l Convalescent Nursing Home, Inc. v. W. Va. Human Rights Comm'n, 431 S.E.2d 353, 357–59 (W. Va. 1993).

. . . ; and (3) the filing of a workers' compensation claim was a significant factor in the employer's decision to discharge or otherwise discriminate against the employee." Powell v. Wyo. Cablevision, Inc., 403 S.E.2d 717, 721 (W. Va. 1991). The majority opinion states that Anderson "has failed to present sufficient evidence to create a genuine issue of material fact" regarding the third, "nexus" element, i.e., whether "her filing of a workers' compensation claim was a significant factor in CCC's decision to terminate her." Ante, at 13. I disagree.

Due to the typical lack of direct evidence in employment retaliation cases, we are to examine circumstantial evidence when evaluating the third element of a plaintiff's prima facie case, including "[p]roximity in time of the claim and the firing," "[e]vidence of satisfactory work performance and supervisory evaluations before the accident," and "[a]ny evidence of an actual pattern of harassing conduct for submitting the claim." Powell, 403 S.E.2d at 721.

Here, Anderson offered evidence with respect to each of these factors. First, with respect to the "proximity in time" factor, Anderson began receiving workers' compensation benefits on November 4, 2009, was released to return to work by her physician on March 24, 2010, effective March 29, without restrictions, was informed on April 25 that she would not be allowed to return to work, and was terminated on June 22. The

23

proximity among these various dates contributes to a permissible inference that the workers' compensation claim was a "significant factor" in Anderson's termination.  Id.

Second, the record contains "[e]vidence of satisfactory work performance and supervisory evaluations before the accident."  Id.  Anderson was employed continuously with CCC from October 15, 1981, through the date of her termination; in that time, she established a "good work record" and was "well thought of by both Management and her fellow employees."  J.A. 858.

Third, although there was no "pattern of harassment" following the submission of Anderson's workers' compensation claim, Powell, 403 S.E.2d at 721, there is evidence that before learning of the initial return-to-work examination, Anderson received a call from an employee of Wells Fargo, CCC's workers' compensation administrator, advising Anderson that CCC was "going to make an issue of the osteoporosis" and "was going to put the screws to" her.  J.A. 136–37.

Finally, in addition to the above factors, a trier of fact is permitted to consider any circumstantial evidence relevant to the "nexus" prong.  Such evidence includes the fact that CCC is self-insured, and that CCC regularly sends to its human resources managers workers' compensation claim reports that include information about the cost of benefits paid to each

24

injured miner.  Such evidence suggests that CCC may have been unusually concerned about the costs of its workers' compensation program.  See Nestor v. Bruce Hardwood Floors, L.P., 558 S.E.2d 691, 695–96 (W. Va. 2001) (finding a triable question of fact where "[the employer's] supervisor bonus system could encourage a supervisor to discriminate against an employee who files for workers' compensation benefits, even if . . . the bonus system helps reduce workplace injuries").

In sum, Anderson presented sufficient evidence to establish all three elements of a prima facie workers' compensation retaliation case, including evidence that her workers' compensation filing was a significant factor in CCC's decision to fire her.

## II.

Both parties appear to concede, and the majority assumes, that the requirements of section 77-1-4.8 apply "when, in response to an employee's prima facie case, the employer asserts that an employee cannot safely perform her job as a legitimate, non-discriminatory reason for termination."  Ante, at 16.  I agree.  See Ranger Fuel Corp. v. W. Va. Human Rights Comm'n, 376 S.E.2d 154, 160 (W. Va. 1988) ("The fact that an applicant's handicap creates a reasonable probability of a materially enhanced risk of substantial harm to the handicapped person or others is a legitimate, nondiscriminatory reason [for an adverse

25

employment action]."); Syl. Pt. 3, Davidson v. Shoney's Big Boy Rest., 380 S.E.2d 232, 233 (W. Va. 1989) ("[T]o satisfy the standard of a serious threat to one's health or safety, the employer must establish that it relied upon competent medical advice that there exists a reasonably probable risk of serious harm."). In short, it is quite clear that CCC was required to meet the standards of section 77-1-4.8 for its termination decision to be "legitimate" and "non-discriminatory."

Those standards are detailed and rigorous. See ante, at 15-16. And at summary judgment this Court is tasked with determining, inter alia, if there is any "genuine dispute," Fed. R. Civ. P. 56(a), as to whether CCC's termination decision was "based on a reasonable medical judgement," one founded "on the most current medical knowledge and/or on the best available objective evidence." W. Va. Code R. § 77-1-4.8.

Significant to my disagreement with the majority view, the dispositive question is not, as the majority's discussion suggests, whether CCC "utilized doctors who had the ability to conduct the medical testing specific to Anderson's condition and who were experienced in providing occupational medical evaluations." Ante, at 18. Rather, by its plain terms, section 77-1-4.8 requires that the assessment be "reasonable"

26

and based on "the most current medical knowledge" or the "best available objective evidence."[2]

Nor is the dispositive question, as the majority's discussion elsewhere suggests, whether CCC complied with the terms of its collective bargaining agreement. See ante, at 14, 17. That is not what section 77-1-4.8 says. Indeed, on more than one occasion, West Virginia's highest court has recognized that a facially neutral company policy can be exploited to achieve a discriminatory objective. Skaggs v. E. Associated Coal Corp., 569 S.E.2d 769, 777 (W. Va. 2002) (noting that "the employer's use of a system of preferred providers for rehabilitation services . . . could be interpreted as a pretext for a scheme to terminate employees who had received workers' compensation benefits"); Wriston v. Raleigh Cty. Emergency Servs. Auth., 518 S.E.2d 650, 659 (W. Va. 1999) ("[W]hile an employment policy may be facially neutral, it cannot be applied in a manner that nullifies or trumps the protective requirements of [a statutory prohibition on discriminatory practices].").

---

[2] The majority opinion posits that "and/or" should be read simply as a disjunctive "or." Ante, at 18 n.6. I will not quibble with the majority's interpretation, because in this case, there is a genuine dispute as to whether the judgment in question was based on either the most current medical knowledge or the best available objective evidence.

Section 77-1-4.8 did not require that CCC get the approval of a specialist or that it comply with the terms of its own policies. It did require that CCC's termination decision be "based on a reasonable medical judgement," one founded "on the most current medical knowledge and/or on the best available objective evidence." W. Va. Code R. § 77-1-4.8. Here, there is clearly at least a genuine dispute as to whether those standards were met.

In countering the initial medical evaluation by Anderson's treating orthopedic surgeon, who cleared Anderson for work,[3] CCC relied upon the evaluations of three doctors, none of whom had any special expertise in osteoporosis, and all of whom relied heavily on a single study that they appear by their own

_____

[3] Anderson has presented the evaluations of two doctors with specialized expertise in osteoporosis concurring with Dr. McKinley's initial clearance of Anderson for work. One of these doctors—Dr. Bellantoni—has "23 years of experience as a faculty physician at Johns Hopkins University School of Medicine with an expertise in the evaluation and treatment of metabolic bone disorders including osteoporosis." J.A. 703. This expert evidence is not necessary to or sufficient for my analysis, and I do not intend to convert every "direct threat" case into a battle of the experts. Nevertheless, Anderson's expert evidence is at least relevant in determining whether there is a genuine dispute regarding whether the medical judgment CCC relied upon in terminating Anderson complied with the standards outlined in section 77-1-4.8, including whether that judgment was "reasonable." See Echazabal v. Chevron USA, Inc., 336 F.3d 1023, 1033 (9th Cir. 2003) (explaining the relevance of a plaintiff's expert evidence in an analogous federal suit, brought under the Americans with Disabilities Act of 1990).

admission either to have misunderstood or to have never read in the first place. To illustrate why there is at the very least a genuine dispute as to whether these evaluations were based on "the most current medical knowledge" or the "best available objective evidence," W. Va. Code R. § 77-1-4.8, I briefly discuss each.

Dr. Steinman was the first CCC doctor to examine Anderson. His conclusion that Anderson's osteoporosis prevented her return to work was discussed in a single paragraph, and his discussion of Anderson's fracture risk relied upon a single study peddling a particular fracture risk score ("FRISK") for osteoporosis patients (the "FRISK study"). Dr. Steinman's deposition testimony suggests that a Google search led him to this study.[4]

In applying the FRISK study to Anderson, Dr. Steinman self-admittedly committed several errors. First, although Dr.

---

[4] "Q. Well, you could have gone on – back in 2010, you could have gone on medical journal databases and done some additional research, couldn't you?
A. What I did, I thought, was the – everything that I could do.
Q. Sir, couldn't you have gone on PubMed – PubMed, P-U-B, capital P, M-E-D, capital M?
A. It's my understanding that what I normally do in looking for things is actually bigger than PubMed –
Q. Where did you normally go – you go?
A. – because I – I get things that are above and beyond PubMed.
Q. Where did you go? Where did you do the research where you came up with this article as the state of the art?
A. Just do database –
Q. What database? Google? You just Google?
A. Google, Bing, anything that's available." J.A. 578.

Steinman intended to cite the study that developed the FRISK score, he instead cited a letter to the editor critiquing that study on the grounds that it over-predicted fracture risk. Second, while Dr. Steinman previously interpreted the FRISK study to mean that Anderson had at least a fifty-percent probability of a fracture within two years, he now concedes gross error: It turns out that figure was only ten percent.

Finally, it appears that the FRISK study's findings were at best marginally relevant to Anderson. The study was based on a cohort of subjects significantly older and less physically active than Anderson, facts Dr. Steinman was unaware of at the time, and the fracture risk score the study developed was intended for use in the context of making treatment decisions, not fitness-for-work evaluations.

CCC also relied upon Dr. Ripepi's "chart review" of Dr. Steinman's report, which was limited to examining that report and the four corners of Anderson's medical records. Dr. Ripepi noted that he agreed completely with Dr. Steinman's conclusions, and specifically that Anderson would be at a high risk of repeat fracture, a conclusion Dr. Steinman had based primarily on his self-admittedly flawed understanding of the FRISK study. However, in his deposition, Dr. Ripepi admitted that he never

30

read that study.[5]  Rather, he assumed Dr. Steinman was "familiar with that literature": in Dr. Ripepi's words, it "is a pretty good assumption, that if you're going to quote something, then you're pretty darn sure of it."  J.A. 780.  Here, that was not a good assumption to make.

Finally, CCC relied upon Dr. Sethi's evaluation of Anderson, which in turn relied upon the previous evaluations by Drs. Steinman and Ripepi.  In his deposition, Dr. Sethi also admitted that he never read the FRISK study.[6]  Indeed, he too

---

[5] "Q. Did you review the article – literature [Dr. Steinman] relied on at the time you rendered your opinion that you agreed with him?
A. No. I agreed with his report.
Q. Did you review the literature that he relied on? . . .
A. No.
Q. Have you ever reviewed the literature he relied on?
A. No."  J.A. 772.


[6] "Q. Doctor, when you said the fracture risk was developed by Dr. J. Gorricho, published by the Journal of Radiologists on October 1, 2007, before you put that in your report, did you check out and see if that was true?
A. Doctor – I am simply – I am reporting in the context of a review of the medical records. I'm not treating physician. I'm not criticizing. I do not need to look up that. I am simply going by what is in the record and simply quoting another person's – what they said. And the review of the record is only a review of the records. It is –
Q. Did you check – I'm sorry.
A. I don't know – I do not need to check anything.
Q. But my question is did you check and see if what Dr. Steinman said about the Gorricho fracture risk was true? Did you check and see if it was true?
A. I do not need to check it because my role is only reviewing the record and quoting what is in the record.
(Continued)

31

erroneously cited the letter to the editor critiquing the study he meant to cite. Although Dr. Sethi reviewed Dr. McKinley's evaluation of Anderson, clearing her for work, he discredited that evaluation on the grounds—now somewhat ironic—that Dr. McKinley did not base her conclusion on specific medical studies. Much of Dr. Sethi's analysis had nothing to do with Anderson specifically. The rest was based on the errant assessments of fracture risk made by Drs. Steinman and Ripepi, or what Dr. Sethi later admitted to relying on: "common sense." J.A. 823. Although Dr. Sethi attached to his evaluation a copy of one medical article on osteoporosis and a partial copy of another, these studies are nowhere referenced or discussed in his evaluation.

In sum, CCC's doctors relied on an inapplicable study and on each others' faulty evaluations to conclude that Anderson's osteoporosis precluded her from returning to work. I simply cannot join the majority opinion in concluding that there exists no genuine dispute as to whether those troubled evaluations were "reasonable" and based on "the most current medical knowledge"

---

Q. So the answer then is, no, you did not check it?
A. I do not need to check it.
Q. And so you did not check it?
A. I did not." J.A. 810-11.

32

or the "best available objective evidence." W. Va. Code R. § 77-1-4.8.

## III.

In conclusion, in my view, Anderson has made out a prima facie case of disability discrimination and workers' compensation retaliation. Additionally, material issues of fact remain regarding whether CCC has met West Virginia's mandatory standards for what constitutes a legitimate, non-discriminatory basis for termination under these circumstances. Where an evaluating doctor has himself conceded that his methodology was erroneous, I cannot conclude that it is beyond dispute that such a judgment was "reasonable" and based on "the most current medical knowledge" or "the best objective evidence." Therefore, summary judgment should have been denied. Accordingly, I respectfully dissent.